USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

-v-

WILLIAM RAMON DURAN PAULINO

Defendant.
------------------------------------------------------------X

No. 12 Cr. 799 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Defendant William Ramon Duran Paulino moves to suppress evidence seized on June 19, 2012 during a search of 4345 Webster Avenue, Apartment 4B, Bronx, New York, including statements made subsequent to the search,[1] and from a motor vehicle located outside of 4345 Webster Avenue. For the reasons stated below, the Court finds that Duran Paulino consented to both searches and his motion is thus denied.

I. **Background**[2]

On June 19, 2012, Marlow Luna, a special agent with the Drug Enforcement Agency ("DEA"), New York Drug Enforcement Task Force ("Special Agent Luna"), along with Eric Patton, an investigator with the New York State Police assigned to the Drug Enforcement Task Force, ("Investigator Patton") (collectively, the "Officers"), were investigating an apartment building located at 4345 Webster Avenue, Bronx, New York (the "Building"), which was believed to be a "narcotics location." (Apr. 29, 2013 Hr'g Tr. ("Tr.") 4:22-5:2, 47:8-13.) As part of their investigation, the Officers entered the Building and walked up the stairs to the fourth floor to conduct surveillance of Apartment 4B (the "Apartment"). (Id. at 7:1-23, 47:19-20.)

---

[1] At the evidentiary hearing held on April 29, 2013, the Government indicated that it is not seeking to admit any statements made by Duran Paulino. (Apr. 29, 2013 Hr'g Tr. ("Tr.") 26:3-5.)

[2] The following facts are drawn from the testimony and exhibits provided at the evidentiary hearing, as well as the declarations submitted in connection with the instant motion.

They remained in the stairwell with the door to the hallway propped open to monitor activity in the hallway and the Apartment. (Id. at 7:23-8:3, 48:2-9.)

A short time after the Officers entered the stairwell, Special Agent Luna heard the noise of a door opening and the Officers walked in the direction of the Apartment, where they saw an individual later identified as Duran Paulino closing the door of the Apartment with a key. (Id. at 8:18-23, 9:13-20.) Duran Paulino walked towards the Officers, who were in plain clothes and had law enforcement badges around their necks. (Id. at 11:7-19, 48:10-13, 52:1-8.) Their guns were holstered, Special Agent Luna's in his ankle holster and Investigator Patton's in his hip holster. (Id. at 11:22-12:1, 52:9-15.) The Officers encountered Duran Paulino and Special Agent Luna, speaking in English, identified himself and Investigator Patton as police. (Id. at 10:14-24.) Upon realizing that he did not understand English, Special Agent Luna proceeded to speak to him in Spanish. (Id. at 11:1-4.) Special Agent Luna again identified himself and Investigator Patton as police and asked Duran Paulino for identification, which he provided. (Id. at 12:12-16.) Special Agent Luna then asked Duran Paulino several questions, the sequence of which is not clear from his testimony.[3] Special Agent Luna asked him if there were other people in the Apartment, to which Duran Paulino responded that there were not. (See, e.g., id. at 17:11-18:11.) Special Agent Luna also asked him if they could search the Apartment, to which he responded that they could. (See, e.g., id. at 13:5-16, 14:3-13.) Finally, Special Agent Luna

---

[3] As noted by Duran Paulino, there are inconsistencies in Special Agent Luna's testimony regarding the sequence of the questions he asked. At the evidentiary hearing, Special Agent Luna first testified that, after asking Duran Paulino for identification, he asked if there was anything illegal in the Apartment and then if they could search the Apartment. (Tr. 13:5-11.) He further testified that, after receiving consent but before entering the Apartment, he asked Duran Paulino if there was anyone else in the Apartment. (Id. at 17:11-18:1.) On cross-examination, Special Agent Luna testified that his first question to Duran Paulino after seeing his identification was whether there was anyone else in the Apartment, (id. at 28:20-22, 36:13-18), after which he then asked if they could search the Apartment, (id. at 28:23-25, 36:21-25). Special Agent Luna also testified that he asked if there was anything illegal in the Apartment once inside. (Id. at 16:25-17:5, 30:21-22.) Despite these inconsistencies, after careful review of his demeanor and testimony, the Court finds Special Agent Luna to be a credible witness. Moreover, as discussed below, the sequence of questions does not bear on whether Duran Paulino gave consent.

2

asked him if there was anything illegal in the Apartment, to which he responded that there was not. (See, e.g., id. at 13:9-16.) Investigator Patton remained behind Special Agent Luna throughout this encounter. (Id. at 63:16-17.) Because he does not speak Spanish, Investigator Patton did not understand or participate in their conversation. (Id. at 13:23-25, 50:23-51:4.) During this encounter—which, according to Investigator Patton, lasted approximately one to two minutes—Duran Paulino remained "calm" and did not appear "confused or . . . bothered." (Id. at 14:13-16, 51:8-9, 51:17-20.) There was no physical contact between the Officers and Duran Paulino. (Id. at 15:11-19, 51:21-25.)

Following this exchange, the Officers walked with Duran Paulino to the Apartment. (Id. at 14:18-19.) Special Agent Luna asked Duran Paulino to unlock and open the door and Duran Paulino complied. (Id. at 15:6-8, 51:11-16.) Special Agent Luna testified that the Officers "had Duran Paulino step to the side" and proceeded to enter the Apartment. (Id. 15:8-10.) Special Agent Luna testified that he then made sure that no one was inside and the Officers brought Duran Paulino in. (Id. at 15:24-16:3.) Investigator Patton first testified that Duran Paulino first entered the Apartment, followed by Special Agent Luna and Investigator Patton. (Id. at 52:16-22.) After entering the Apartment, Special Agent Luna and Duran Paulino sat down in the living room and conversed in Spanish, (id. at 16:5-12, 53:2-8), while Investigator Patton waited by the door, (id. at 52:23-24). Special Agent Luna recalled that he asked Duran Paulino if there was anything illegal in the Apartment, to which he responded that there was not. (Id. at 16:25-17:10.) Investigator Patton testified that, after a few minutes, Special Agent Luna told him that they had consent to search the Apartment. (Id. at 53:9-18, 59:21-24, 64:23-65:2.) Before then, Investigator Patton testified that Special Agent Luna had not said anything to him about his conversation with Duran Paulino in the hallway. (Id. at 53:19-24.)

3

Having Duran Paulino's consent, Investigator Patton began to search a closet located in the hallway between the bedroom and living room. (Id. at 21:20-23, 54:4-7.) He moved miscellaneous items on the floor of the closet and noticed a particular section of the floor where the nails were not painted, in contrast to the rest of the painted nails. (Id. at 54:9-20.) He "attempted to manipulate the floor[]board and . . . noticed a void in the bottom of the closet," in which he found glassine envelopes with a substance later identified as heroin, as well as coffee grinders, inkpads and rubber stamps. (Id. at 55:19-56:4; see also id. at 21:20-21 (describing the space as a "concealed compartment").)

While Investigator Patton was searching the closet, additional agents arrived and searched other areas of the Apartment, during which they found keys to a motor vehicle (the "Vehicle").[4] (Id. at 18:17-19.) According to Special Agent Luna, the keys were found before any drugs or paraphernalia was recovered in the Apartment and before Duran Paulino was placed under arrest. (Id. at 19:4-7, 19:13-15, 27:2-7.)[5] He did not recall who found them. (Id. at 18:22-23.) Investigator Patton testified that the keys were found after the drugs were recovered from the closet, (id. at 65:20-24), but then clarified that he does not know when the other agents found the keys, as he was still conducting his search when they arrived, (id. at 66:9-22, 67:14-25, 69:19-24).[6] He further testified, in response to defense counsel's question regarding when he "bec[a]me aware that there was consent to search the [V]ehicle," that it was after he found the

---

[4] The agents also found filtered masks in the Apartment. (Tr. 56:25-57:1.)

[5] During cross-examination, defense counsel questioned Special Agent Luna about a prior statement to the Government in which he allegedly stated that drugs were found in the closet before Duran Paulino consented to the search of the Vehicle. (Tr. 31:5-7.) Special Agent Luna responded that he did not recall making that statement and that he obtained consent to search the vehicle before the drugs were discovered. (Id. at 31:8, 31:23-24, 32:6-8.) This was consistent with several other statements during his testimony. (See id. at 19:4-7, 19:13-15, 27:2-7.)

[6] As discussed below, the Court rejects Duran Paulino's argument that Investigator Patton's testimony regarding the discovery of the keys contradicts Special Agent Luna's recollection of the events, and credits Special Agent Luna's testimony.

4

drugs. (Id. at 60:24-61:2, 69:8-11.) Investigator Patton also testified that he does not know who found the keys. (Id. at 61:24-25.)

When Special Agent Luna was notified of the keys, he asked Duran Paulino whose they were, to which Duran Paulino replied that they were his. (Id. at 19:1-2, 20:7-8.) He then asked Duran Paulino where the Vehicle was located, and Duran Paulino stated that it was downstairs. (Id. at 19:2-3, 20:8-9.) Finally, he asked Duran Paulino if the agents could search the Vehicle and Duran Paulino consented. (Id. at 20:20-24.) According to Special Agent Luna, Duran Paulino's demeanor remained "normal" during this exchange. (Id. at 20:25.) The agents, including Investigator Patton, subsequently searched the Vehicle, which was located approximately half a block from the residence, and found glassine envelopes with a substance later identified as heroin in the trunk. (Id. at 20:14-21, 58:8-16.)

Meanwhile, after Investigator Patton notified Special Agent Luna of the drugs and paraphernalia in the closet, (id. at 56:11-13), Special Agent Luna placed Duran Paulino under arrest and asked him about the narcotics, to which he "did not respond," (id. at 22:15-22, see also id. at 25:4-5 (Duran Paulino "declined to answer any questions that [were] posed asking him about the drugs.")). He was not read his Miranda warnings at that time. (Id. at 22:23-24.) Special Agent Luna testified that Duran Paulino's demeanor changed after he learned about the drugs; he became nervous and "realized that he was in trouble." (Id. at 24:20-25:1.) Duran Paulino was subsequently transported to the DEA office, where he was fingerprinted, photographed, Mirandized and interviewed by Special Agent Luna. (Id. at 25:4-8, 25:20-26:12.) Duran Paulino agreed to speak but was "not at all" responsive to the questions asked. (Id. at 26:15-19.)

On October 19, 2012, Duran Paulino was indicted on one count of distribution and

possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 812, 841(a)(1), (b)(1)(B). On February 21, 2013, he filed the instant motion to suppress evidence seized from the Apartment and the Vehicle as well as statements made in connection with the search of the Apartment. An evidentiary hearing was held on April 29, 2013. The Government called two witnesses: Special Agent Luna and Investigator Patton. Duran Paulino did not call any witnesses.

## II. Discussion

Duran Paulino contends that he never consented to the search of either the Apartment or the Vehicle and that all evidence seized from the searches must therefore be suppressed. In his declaration submitted in support of the motion, Duran Paulino asserts that an agent asked to him to open the door to the Apartment so that the agent could "see if there were any other people inside the [A]partment," and that when Duran Paulino unlocked the door, "the agent put his head into the door way and confirmed there was no one inside." (Decl. of William Ramon Duran Paulino, Feb. 10, 2013, ¶¶ 5, 6.) According to the declaration, the agent "then pushed his way inside and stated that he would look around the [A]partment." (Id. ¶ 6.) Duran Paulino further states that he told the agent that "he had no right to enter and search the [A]partment." (Id. ¶ 7.) As to the Vehicle, Duran Paulino asserts that the agents asked him about car keys that were inside the Apartment, which he "refused to answer" and that he did not give consent to search the Vehicle. (Id. ¶¶ 9, 10.) He argues that the testimony of the Officers should be discredited due to the inconsistencies contained therein, and that the Officers' failure to obtain written consent further supports his position that consent was never given. The Government responds that Duran Paulino voluntarily gave verbal consent to both searches and asks the Court to credit the testimony of the Officers. For the reasons stated below, the Court finds that Duran Paulino

6

voluntarily consented to both searches and denies his motion to suppress.

A.  **Legal Standard**

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978) (internal quotation marks omitted).[7] One such exception is made "when the search is conducted pursuant to the consent of an authorized person." United States v. Snype, 441 F.3d 119, 130 (2d Cir. 2006) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). For consent to be valid, it must be "voluntary," which is a "question of fact determined from a totality of all the circumstances.'" Schneckloth, 412 U.S. at 227. Consent to search must be the "product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995). "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." Id.; see also Schneckloth, 412 U.S. at 228 (Consent must "not be coerced, by explicit or implicit means, by implied threat or covert force."). "[W]hen . . . the [G]overnment relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." Snype, 441 F.3d at 131.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500

---

[7]  The Fourth Amendment protects private persons from unreasonable government intrusions only "into areas where they have a legitimate expectation of privacy." United States v. Snype, 441 F.3d 119, 130 (2d Cir. 2006). It is undisputed that, as an overnight guest in the Apartment, Duran Paulino had a legitimate expectation of privacy in the premises. See id. (citing Minnesota v. Olson, 495 U.S. 91, 98 (1990)).

U.S. 248, 251 (1991). Thus, "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to" conduct the search that was undertaken. Id. at 249. When making this determination, the "totality of the circumstances [] must be considered." Garcia, 56 F.3d at 423. A suspect may "delimit as he chooses the scope of the search to which he consents[,] [b]ut if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." Jimeno, 500 U.S. at 252. Furthermore, "[i]f the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way." United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995).

**B.  Duran Paulino Consented to the Search of the Apartment and the Vehicle**

The Court finds that, based on the totality of the circumstances, Duran Paulino voluntarily consented to the search of the Apartment and the Vehicle on June 19, 2012. In making this determination, the Court finds credible the testimony of Special Agent Luna and Investigator Patton despite some inconsistencies in their testimony. Moreover, although the Court also considered Duran Paulino's declaration, the Officers' testimony is afforded greater weight because it was subject to cross-examination. See United States v. Yong Wang, No. 11 Cr. 730 (PGG), 2013 WL 452215, at *7 (S.D.N.Y. Feb. 5, 2013) (collecting cases); United States v. Al-Marri, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) ("[T]his Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to [defendant's] version of the facts."); see also United States v. Peña Ontiveros, 547 F. Supp. 2d 323, 333 (S.D.N.Y. 2008) (crediting agents' testimony and rejecting defendants' affidavits which were not subject to cross-

8

examination).

1. **The Apartment**

The Government has met its burden of showing that Duran Paulino voluntarily consented to the search of the Apartment on June 19, 2012. When the Officers first encountered Duran Paulino in the hallway, Special Agent Luna engaged in a conversation with him for approximately one to two minutes. Despite his assertion to the contrary, the Court finds that during this conversation, Duran Paulino consented to a search of the Apartment and subsequently unlocked the Apartment door to permit the Officers to enter. There is no evidence in the record, nor has it been argued, that the Officers engaged in coercive tactics or that Duran Paulino felt threatened to give his consent. To the contrary, Duran Paulino was "calm," (Tr. 51:20), and did not appear "confused or . . . bothered" by the exchange, (id. at 14:13-16). There was no physical contact between the Officers and Duran Paulino, and the Officers' weapons remained holstered the entire time. Moreover, once they entered the Apartment, Duran Paulino did not display any behavior that would indicate resistance to the search. (Id. at 23:24-24:2, 55:4-11.)[8] Such circumstances demonstrate that Duran Paulino consented to the search of the Apartment and that such consent was voluntary. See, e.g., Peña Ontiveros, 547 F. Supp. 2d at 334 (finding voluntary consent when no guns were drawn, defendant was not in custody, he was not subject to any physical punishments or threats, he was calm during interactions with the police, and he was not subject to questioning before giving consent); United States v. Fuentes, No. 07 Cr. 329 (SHS), 2007 WL 2319142, at *5 (S.D.N.Y. Aug. 10, 2007) (finding voluntary consent when defendant

---

[8] The only evidence of resistance comes from Duran Paulino's declaration, in which he states that, after the agent "pushed his way inside" to "look around the [A]partment," he told the agent that he had "no right to enter and search the [A]partment." (Duran Paulino Decl. ¶¶ 6, 7.) This statement, however, was not supported by any testimony or evidence presented at the hearing, and was contradicted by the testimony of both officers. (Tr. 23:24-24:2, 55:4-11.)

was not in custody when he consented and there was no evidence of the use of threats or display of force in obtaining consent); United States v. Jones, 154 F. Supp. 2d 617, 621-22 (S.D.N.Y. 2001) (finding voluntary consent when officers did not remove their weapons from holsters or make threatening or coercive gestures toward the consenting individual, the conversation lasted no more than two minutes, and the individual was calm while answering the officers' questions).

In addition to asserting in his declaration that he did not provide consent to search the Apartment, Duran Paulino raises several arguments in support of his position based on the testimony at the hearing. First, Duran Paulino asserts that the inconsistencies in Special Agent Luna's testimony regarding the sequence of questions asked in the hallway cast doubt on his credibility. For example, Special Agent Luna first testified that he asked Duran Paulino if there was anything illegal in the Apartment and then asked if they could search the Apartment, (Tr. 13:5-11), while he later testified that he first asked if there was anyone else in the Apartment and then asked if they could search, (see id. at 36:13-18, 36:21-25.)[9] Although there were such inconsistencies in his testimony, the Court nonetheless finds, after careful review of his demeanor and his testimony, Special Agent Luna to be a credible witness. See United States v. Iodice, 525 F.3d 179, 186 (2d Cir. 2008) (finding no error when district court credited testimony despite inconsistencies); see also United States v. Rios, No. 09 Cr. 369 (CPS), 2009 WL 2602202, at *6 (E.D.N.Y. Aug. 24, 2009) (finding officer's testimony credible despite inconsistencies regarding the sequences of events regarding the stop and frisk of defendant given the "rapidity of the events" to which officer testified).

Moreover, the order of the questions asked does not bear on whether Duran Paulino in fact consented to the search of the Apartment. Indeed, Special Agent Luna consistently testified

---

[9] See supra note 3 for additional information regarding his testimony.

as to Duran Paulino's responses to each question—including his consent to the search—and there is no evidence in the record, beyond Duran Paulino's own declaration, to show that he did not. See United States v. Wilson, No. 12 Cr. 610 (RPP), 2012 WL 6641492, at *9 (S.D.N.Y. Dec. 18, 2012) (finding voluntary consent where, despite inconsistent testimony as to the sequence of events regarding when consent was obtained, defendant presented no evidence of coercion); Al-Marri, 230 F. Supp. 2d at 539 (finding consent where, despite defendant's affidavit to the contrary, both officers testified that defendant consented to the search); see also United States v. Awan, 384 F. App'x 9, 15 (2d Cir. 2010) (affirming district court's credibility determination regarding agents' testimony despite inconsistency because, among other reasons, the inconsistency "does not bear on whether [defendant] was coerced when he provided oral consent to the search").

Duran Paulino also asserts that Special Agent Luna and Investigator Patton testified inconsistently as to when they obtained consent to search the Apartment. In particular, he contends that Special Agent Luna's testimony that Duran Paulino consented to the search of the Apartment during their conversation in the hallway differed from Investigator Patton's testimony that he learned of the consent once they were in the Apartment, and that those inconsistencies should lead the Court to reject their testimony as not credible. The Court disagrees.

Significantly, consistent with Special Agent Luna's testimony that Duran Paulino consented to the search of the Apartment, Investigator Patton testified that Special Agent Luna informed him that Duran Paulino consented, and at no time displayed resistance to the search. (Tr. 53:9-18, 55:4-11.) See also United States v. Harris, No. 11 Cr. 92 (RPP), 2011 WL 3273241, at *12 (S.D.N.Y. July 27, 2011) ("While the government witnesses' testimony was not entirely consistent, both officers testified that [defendant] gave his consent."). Moreover, their

11

statements are better understood as recounting different perspectives of the event. Only Special Agent Luna spoke directly to Duran Paulino; Investigator Patton did not participate and could not understand the conversation, as he does not speak Spanish. Investigator Patton testified that in the first communication between the Officers after encountering Duran Paulino—which occurred within a few minutes of entering the Apartment—Special Agent Luna told Investigator Patton that Duran Paulino consented to the search. The fact that Special Agent Luna did not notify Investigator Patton of Duran Paulino's consent sooner does not discredit his testimony that consent was in fact given in the hallway. Special Agent Luna's testimony is further corroborated by the undisputed evidence that Duran Paulino unlocked the door to the Apartment to let the Officers in. (Tr. 15:6-8, 51:11-16; Duran Paulino Decl. ¶ 6.) See United States v. Camilo, 287 F. Supp. 2d 446, 452 (S.D.N.Y. 2003) (finding that individual's conduct of holding the door open for agents to enter the apartment corroborated the fact that she verbally agreed to let them in).

Finally, Duran Paulino argues that the Officers' failure to provide a "consent to search form" weighs against a finding of consent. It is well-established, however, that consent can be oral or written; a consent to search form is not a prerequisite to finding valid consent. See Peña Ontiveros, 547 F. Supp. 2d at 336 n.6; United States v. Anderson, No. S1 04 Cr. 1131 (JFK), 2005 WL 497778, at *4 (S.D.N.Y. Mar. 3, 2005).[10] The Court credits the Officers' testimony regarding Duran Paulino's consent to search the Apartment and the Government has thus met its burden of proving such consent by a preponderance of the evidence.[11]

---

[10] Duran Paulino also raises this argument to contest the validity of his consent to search the Vehicle, which the Court rejects for the reasons stated above.

[11] At the evidentiary hearing, defense counsel also questioned Special Agent Luna about the investigation that led the Officers to the Apartment in an attempt to argue that if the Officers had probable cause to search the Apartment, then consent was not necessary. The Court sustained an objection to this line of questioning on the grounds of relevance and ruled that the Officers' ability to get a search warrant is not relevant to whether the

12

## 2. The Vehicle

A review of the totality of the circumstances also demonstrates that, despite his assertion in his declaration to the contrary, Duran Paulino voluntarily consented to the search of the Vehicle on June 19, 2012. In the course of the search of the Apartment, keys to the Vehicle were recovered, which Duran Paulino confirmed were his. In response to further questioning from Special Agent Luna, Duran Paulino provided the location of the Vehicle and verbally consented to a search of it. At the time of this consent, Duran Paulino and Special Agent Luna were still sitting in the living room. Special Agent Luna testified that they were "talking with no problem, no issues." (Tr. 39:2-3.) According to Special Agent Luna, Duran Paulino gave his consent to search the Vehicle before drugs or paraphernalia was found in the Apartment and before he was handcuffed or placed under arrest. There is no evidence, nor does Duran Paulino argue, that he was coerced, forced or threatened into giving his consent. See, e.g., Peña Ontiveros, 547 F. Supp. 2d at 333-34; Jones, 154 F. Supp. 2d at 621-22.

Duran Paulino contends that he never consented to a search of the Vehicle and argues that the Officers' testimony should be discredited in light of inconsistencies in and between their testimony. Specifically, he asserts that they testified inconsistently as to whether the drugs found in the closet were discovered before or after the keys were found. As previously noted, Special Agent Luna testified on several occasions that the keys were found and consent to search the Vehicle was obtained before any drugs were recovered. (See Tr. 19:4-7, 19:13-15, 27:2-7, 32:6-8.) Investigator Patton, on the other hand, first testified that he believed the keys were found after the drugs were found in the closet. (Id. at 65:20-24.) After further questioning from counsel

---

Officers obtained consent from Duran Paulino. (Tr. 44:13-45:10.) See Schneckloth, 412 U.S. at 228 ("[I]n those cases where there is probable cause to arrest or search, but where the police lack a warrant, a consent search may still be valuable."); see also United States v. O'Brien, 498 F. Supp. 2d 520, 536 (N.D.N.Y. 2007) ("The existence of probable cause is irrelevant to searches or seizures based on consent.").

13

and the Court, however, Investigator Patton clarified that he does not know when the other agents found the keys in relation to his discovery of the drugs because he was still searching the closet when this occurred. (Id. at 66:9-22, 67:14-25, 69:19-24.) Upon reviewing the testimony in its entirety, the Court credits Special Agent Luna's testimony on this point. Investigator Patton's testimony was not contradictory; it reveals that he was not involved in or present when the agents found the keys and brought them to Special Agent Luna. Investigator Patton was only able to testify to when he "bec[a]me aware" of the keys and the consent to search the Vehicle— which was after he recovered the drugs, (id. at 60:24-61:2, 69:8-11)—but could not speak to when the keys were in fact found or by whom, (id. at 61:24-25, 66:9-12).

Even assuming, however, that the drugs were found before the keys and that Duran Paulino was placed under arrest, (see Duran Paulino Decl. ¶ 9), this would not vitiate Duran Paulino's voluntary consent. See United States v. Moreno, 701 F.3d 64, 77 (2d Cir. 2012) ("We have repeatedly observed that . . . the fact that a person is in custody . . . [does not] rule out a finding of voluntariness."). Although Special Agent Luna testified that Duran Paulino's demeanor changed when confronted with the drugs, there remains no evidence of threats or coercion on the part of the Officers to obtain consent. Accordingly, the Court finds that the Government has met its burden of proving by a preponderance of the evidence that Duran Paulino consented to a search of the Vehicle.

## III. Conclusion

For the foregoing reasons, Duran Paulino's motion to suppress is denied. The Clerk of Court is respectfully directed to close the motion at docket number 22.

Trial has been scheduled in this case for August 12, 2013.

SO ORDERED.

Dated: May 21, 2013
New York, New York

Ronnie Abrams
United States District Judge